FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR NORTHERN DISTRICT OF INDIANA

19 JUL -2 AM 11: 43

ROBERT N. TRGOVICH
U.S. DISTRICT COURT
FOR THE NORTHERN DISTRICT
OF INDIANA

LOCAL LODGE NO. 1620 OF THE
INTERNATIONAL BROTHERHOOD OF
BOILERMAKERS, IRON SHIP BUILDERS,
BLACKSMITHS, FORGERS AND
HELPERS,

Plaintiff,

v.

Case No. **1:19CV297**

TDY Industries, LLC d/b/a ATI Forged
Products, a California Corporation,
Serve:  Commercial Registered Agent
       C T Corporation System
       150 West Market Street, Suite 800
       Indianapolis, IN 46204

Defendant.

## COMPLAINT

Plaintiff Boilermakers Local Lodge 1620 ("Plaintiff" or "Union") files this cause of action against Defendant TDY Industries, LLC d/b/a ATI Forged Products ("Defendant" or "ATI") seeking injunctive relief in aid of arbitration of a grievance filed pursuant to a collective bargaining agreement ("CBA") between Plaintiff and Defendant.  The parties dispute whether the CBA binds Premier Forge Group, LLC ("Premier Forge"), who recently bought or is buying, through a sale, a plant where Plaintiff represents certain employees.

This Complaint and the contemporaneously filed preliminary injunction motion pray the Court enjoin the sale until the parties can fully arbitrate whether Premier Forge must assume the CBA.  In support of this Complaint, Plaintiff states as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter under Section 301 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185, as well as 28 U.S.C. § 1331.

2.      The Northern District of Indiana is the proper venue under 29 U.S.C. § 185(a).

## PARTIES

3.      Plaintiff is a "labor organization representing employees in an industry affecting commerce" within the meaning of Section 2(5) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 152(2) and Section 301(a) of the LMRA, 29 U.S.C. § 185(a), and is a legal entity that may sue or be sued, under 29 U.S.C. § 185(b).

4.      Defendant TDY Industries, LLC d/b/a ATI Forged Products is an active Foreign Corporation in good standing existing under California law and may be served at the office of its registered agent, C T Corporation System, 150 West Market Street, Suite 800, Indianapolis, Indiana 46204.  Defendant maintains a place of business at 250 E. Lafayette St., Portland, IN 47371.  Defendant is engaged in an industry or activity affecting commerce within the meaning of Section 2(2) of the NLRA, 29 U.S.C. § 152(2) and Section 301(a) of the LMRA, 29 U.S.C. § 185(a), and is a legal entity that may sue or be sued, under 29 U.S.C. § 185(b).

## GENERAL ALLEGATIONS

5.      Plaintiff restates and incorporates herein Paragraphs 1 through 4.

6.      On May 1, 2017, the parties entered into the CBA and the CBA is set to expire on April 30, 2021. *Ex. 1, Articles 1, 28.*

7.      The CBA applies to a bargaining unit of all employees at Defendant's Portland, Indiana Plant ("Plant") except for Tool and Die Machine Shop, Maintenance Department, and Teamster employees. *Ex. 1, Article 2, Sec. 1.*

2

8.     The CBA expressly provides that it applies to purchasing entities in that it states it is "by and between ATI Forged Products, Portland Operations, *or its successor or assigns*, … and LOCAL LODGE No. 1620, OF THE INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIP BUILDERS, BLACKSMITHS, FORGERS AND HELPERS…." *Ex. 1, Article 1* (emphasis added).

9.     Under the CBA's dispute resolution provision, if the parties disagree about the meaning and application of the CBA, the parties may file a grievance. *Ex. 1, Article 6, Sec. 1*.

10.     The last step in the grievance process is binding arbitration. *Ex. 1, Article 6, Sec. 2*. The procedures for conducting this binding arbitration are laid out in the CBA.

11.     By letter dated June 3, 2019, Premier Forge and Defendant provided notice to Plaintiff regarding an alleged Asset Purchase Agreement and other agreements ("APA"). *Ex. 2*.

12.     According to the June 3, 2019 letter, Premier Forge acquired certain assets of Defendant's forging business, including Defendant's manufacturing facility located at 250 E. Lafayette St., Portland, IN 47371, i.e., the Plant; however, the June 3, 2019 letter also indicated that Defendant (a) will continue to employ the employees at the Plant for a period of up to ninety (90) days following the closing date, and (b) will continue to be bound by the CBA. *Ex. 2*.

13.     According to the June 3, 2019 letter, Premier Forge has represented that employment will not necessarily continue for the approximate 105 employees represented by the Union.  It will offer employment to "eligible" bargaining unit employees by August 29, 2019, but Premier Forge has refused to assume or adopt the CBA. *Ex. 2*.

14.     On June 7, 2019, Plaintiff filed a grievance, asserting that Defendant breached Article 1 and all other applicable articles of the CBA by refusing to require Premier Forge to

assume the CBA. In this grievance, Plaintiff requested expedited arbitration and a stay of the

APA. The grievance provided in pertinent part:

> *Description: ATI breached Article 1 of the [CBA], and all other applicable articles. The [CBA] is by and between ATI and its successor or assigns. [Premier Forge]'s letter dated June 3, 2019 sent to the Unions demonstrates ATI breached the Agreement in that the [CBA] is binding upon successors and assigns. ATI may have breached the [CBA] in other ways and the [Union] is continuing to investigate.*
>
> *Remedy: ATI and any successor or assigns remain bound to the [CBA]. ATI is required to secure from any purchaser, as a condition of sale, an assumption of the obligations in the [CBA]. Any applicable make whole remedy for employees impacted by violations. Expedited arbitration is requested. A stay of any sale/transaction, pending or otherwise, is requested in order to afford the employees and the Local the possibility of an adequate remedy and to provide time for the arbitration process to be completed.*

*Ex. 3.*

15. On June 13, 2019, Defendant denied the grievance and refused to arbitrate on an

expedited basis. *Ex. 4.*

16. Since filing the grievance, Plaintiff, through counsel, has request expedited

arbitration, a stay of the APA, and also sought information surrounding the circumstances of the

APA. Defendant has continued to refuse to an expedited arbitration, continued to refuse to stay

the APA, and has not provided Plaintiff any information responsive to its information request

pending since June 12, 2019. *Ex. 5, 6, 7.*

17. Since filing the grievance, Plaintiff has continued to move the grievance through

the grievance steps, but Defendant has continued to deny the grievance. *Ex. 8, 9.*

### BREACH OF CONTRACT/INJUNCTIVE RELIEF IN AID OF ARBITRATION

18. Plaintiff restates and incorporates herein Paragraphs 1 through 17.

19.     By its acts and conduct, Defendant has failed and refused to honor its contractual obligation to arbitrate disputes by proceeding with the APA before an arbitrator has an opportunity to determine whether the APA violates the parties' CBA.

20.     As a result of Defendant's refusal to honor its contractual obligations, immediate and irreparable harm is threatened and will occur unless this Court takes action to prevent such harm.  Specifically, the Union and its affected bargaining unit members will suffer irreparable harm because, if the Union prevails at arbitration, an arbitrator will be unable to formulate an effective remedy due to Defendant's failure to require any purchaser, as a condition of sale, to assume the obligations in the CBA.  The Union and its affected bargaining unit members may also suffer irreparable harm should Defendant no longer exist by the time the arbitration is completed and potentially enforced.

21.     Without an expedited arbitration process and a stay of any sale, including the APA, any favorable decision received by the Union at arbitration will be a hollow victory because the APA will have gone through, the affected bargaining unit employees will either be unemployed or not employed by Defendant, and/or Defendant may or may not continue to exist in order to provide an effective remedy.  Therefore, injunctive relief is necessary to maintain the status quo until the parties obtain a final and binding ruling from an arbitrator concerning the Union's grievance.

22.     Defendant has failed and refused and continues to fail and refuse to expedited arbitration of the grievance concerning the CBA's successorship language.  This failure and refusal is wholly unjustified and in bad faith.  The subject of the grievance is covered by the successorship language in the CBA under the broad language of the grievance-arbitration provisions of the CBA, and thus is arbitrable.

5

23.     Plaintiff's position that the successorship language requires Defendant to secure a promise from any prospective buyer to assume the CBA is sufficiently sound to prevent arbitration from being a futile endeavor. *See Local Lodge No. 1266, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO*, 668 F.2d 276, 285 (7th Cir. 1981).

24.     Plaintiff and the employees it represents lack an adequate remedy at law and will suffer immediate and irreparable injury if the Court does not require Defendant to arbitrate this dispute because the employees represented by Plaintiff risk losing the protections and benefits for which they bargained once Defendant stops employing them.

25.     The balance of harms favors Plaintiff because the employees represented by Plaintiff risk losing the protections and benefits for which they bargained while Defendant would merely have to continue to employ the employees represented by Plaintiff while the arbitration proceeded.

26.     Granting an injunction will favor the public interest in peaceful resolution of labor disputes through arbitration.

**WHEREFORE**, Plaintiff prays that the Court:

(1)     Assume and maintain jurisdiction of this case pending the outcome of the arbitration proceeding;

(2)     Enter a preliminary and thereafter permanent injunction requiring Defendant to:

    a.   Expeditiously arbitrate the grievance;

    b.   Restraining Defendant for proceeding with any contemplated sale and/or dissolution until the Union's grievance has been submitted to an arbitrator agreed to by the parties, the parties have participated in an expedited

arbitration hearing, and Defendant has complied with the decision of the

arbitrator with respect to the Union's grievance;

c.  Preserve the status quo by continuing to employ the employees represented by

Plaintiff under the terms of the CBA pending the outcome of arbitration; and

d.  Take no further actions to undermine or subvert the arbitration process.

(3)  Grant Plaintiff an award of costs and attorneys' fees prosecuting this action; and

(4)  Grant Plaintiff such other relief that the Court may deem just and proper.

Dated:   July 1, 2019

Respectfully submitted:

**Blake & Uhlig, P.A.**

By:     /s/ Jason R. McClitis
        Jason R. McClitis
        *Pro Hac Vice Pending*
        753 State Ave., Suite 475
        Kansas City, Kansas 66101
        (913) 321-8884 - Phone
        (913) 321-2396 – Fax
        jrm@blake-uhlig.com
**ATTORNEYS FOR PLAINTIFF**

**May 1, 2017 – April 30, 2021**

### AGREEMENT

Between

ATI Forged Products, Portland Operations
and the
International Brotherhood
of
Boilermakers, Iron Ship Builders,
Blacksmiths, Forgers and Helpers,

AFL -- CIO

Local 1620

# Original



EXHIBIT

Table of Contents

AGREEMENT .................................................................................................................. 1
ARTICLE I AGREEMENT .............................................................................................. 1
ARTICLE II BARGAINING AGENCY .......................................................................... 1
ARTICLE III UNION SHOP DUES ............................................................................... 2
CHECK-OFF AND ......................................................................................................... 2
NOTICE AND RESPONSIBILITY ................................................................................ 2
ARTICLE IV ................................................................................................................... 3
UNION REPRESENTATION ......................................................................................... 3
ARTICLE V MANAGEMENT RIGHTS ........................................................................ 4
ARTICLE VI .................................................................................................................... 4
GRIEVANCE PROCEDURE .......................................................................................... 4
ARTICLE VII WORK WEEK AND OVERTIME .......................................................... 7
ARTICLE VIII ................................................................................................................. 8
ALLOWED TIME CLAIM .............................................................................................. 8
ARTICLE IX SENIORITY PROCEDURE ..................................................................... 9
ARTICLE X TRANSFERS TO FACILITATE ............................................................. 13
PRODUCTION OR TO UTILIZE ................................................................................. 13
EMPLOYEES' SKILLS ................................................................................................. 13
ARTICLE XI JOB BIDDING PROCEDURE ............................................................... 13
ARTICLE XII JOB VACANCIES ................................................................................. 14
ARTICLE XIII VACATIONS ........................................................................................ 15
ARTICLE XIV COST-OF-LIVING ............................................................................... 16
ARTICLE XV SHIFT DIFFERENTIAL ....................................................................... 16
ARTICLE XVI TIME KEEPING PROCEDURE .......................................................... 16
ARTICLE XVII INSURANCE ....................................................................................... 16
ARTICLE XVIII .............................................................................................................. 18
PENSION PROGRAM ................................................................................................... 18
ARTICLE XIX ................................................................................................................ 20
HOLIDAY PROGRAM ................................................................................................. 20
ARTICLE XX ................................................................................................................. 21
BEREAVEMENT PAY .................................................................................................. 21
ARTICLE XXI JURY DUTY PAY ................................................................................ 21
ARTICLE XXII PAYCHECKS ...................................................................................... 21
ARTICLE XXIII MILITARY SERVICE ....................................................................... 22
ARTICLE XXIV PLANT SAFETY ............................................................................... 22
ARTICLE XXV ............................................................................................................... 22
SANITATION ................................................................................................................. 22
ARTICLE XXVI .............................................................................................................. 23
UNION MONTHLY ....................................................................................................... 23
MEMBERSHIP MEETINGS ......................................................................................... 23
ARTICLE XXVII ............................................................................................................ 23
MISCELLANEOUS PROVISIONS .............................................................................. 23
ARTICLE XXVIII ........................................................................................................... 24
RATE INCREASES ........................................................................................................ 24
ARTICLE XXIX ............................................................................................................. 25
CONTRACT DURATION AND TERMINATION ....................................................... 25
SCHEDULE A ................................................................................................................ 25
HOURLY RATES & INCENTIVE WAGE ................................................................... 25
SCHEDULE "B" NEW EMPLOYEE WAGE PROGRESSION ................................... 26
SCHEDULE "C" ............................................................................................................. 26
PLANT DEPARTMENTS .............................................................................................. 26

i

## ARTICLE 1
## AGREEMENT

THIS AGREEMENT, dated the 1st day of May, 2017, is by and between   ATI Forged Products, Portland Operations, or its successor or assigns, hereinafter referred to as the "Employer" or "Company," and LOCAL LODGE NO. 1620, OF THE INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIP BUILDERS, BLACKSMITHS, FORGERS AND HELPERS hereinafter referred to as the "Union", and this agreement embodies the sole agreement between the aforementioned parties.

### WITNESSETH:

WHEREAS, the Company and the Union have engaged in collective bargaining with respect to rates of pay, wages, hours of work and other conditions of employment on behalf of those employees who constitute the bargaining unit as hereafter set forth:

NOW THEREFORE, it is hereby mutually agreed between the Company and the Union as follows:

### PURPOSE OF AGREEMENT

It is the intent and purpose of the parties hereto to set forth herein the entire agreement covering rates of pay, wages and hours of employment, to be observed in good faith between the parties hereto, and to provide procedure for the prompt and peaceful settlement of all differences, alleged grievances, and disputes which may arise between the Company and its employees or the Union, to the end that there shall be no interruption or impeding of the production process, work stoppages, strikes or other interferences with production, during the life of this agreement.

## ARTICLE 2
## BARGAINING AGENCY

SECTION 1.   In accordance with the Supplemental Decision and Certification of Representatives issued by the National Labor Relations Board subsequent to an election held among the employees of the Company on April 28, 1942, under the direction of the Regional Director of the Eleventh Region of the National Labor Relations Board, the Company recognizes the Union as the sole and exclusive representative for all employees of the Company at Portland, Indiana, for the purpose of collective bargaining, and agrees to meet and bargain with the accredited representatives of the Union on all matters pertaining thereto.

SECTION 2.   Notwithstanding the provisions of Section 1 above, it is agreed that all employees within the following departments:

(A) Tool and Die Machine Shop
(B) Maintenance Department

shall be represented by the International Association of Machinists Lodge No. 1595, for the purpose of collective bargaining and to negotiate an agreement as to all terms and conditions of employment for all eligible employees in said Unit.

1

Notwithstanding the provisions of Section 1 above, it is agreed that all employees within the current Teamster positions shall be represented by the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local Lodge No. 135, for the purpose of collective bargaining and to negotiate an agreement as to all terms and conditions of employment for all eligible employees.

(a)   It is further provided that the foregoing is not to be construed to conflict with the certification issued by the National Labor Relations Board designating the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers as the sole bargaining agency.

(b)   It is further agreed by and between all parties that none of the terms of any separate agreement entered into by and between ATI Forged Products, Portland Operations  and the INTERNATIONAL ASSOCIATION OF MACHINISTS shall conflict with the general terms of this agreement.

## ARTICLE 3
## UNION SHOP DUES
## CHECK-OFF AND
## NOTICE AND RESPONSIBILITY

SECTION 1.  Union Membership.   Employees shall have the option to become members of the Union commencing sixty (60) calendar days from the last date of hire.

The Company shall notify the Union through the Local Financial Secretary of all new employees who have completed sixty (60) calendar days of service with the Company.  The Union agrees to accept all such eligible employees as members.

The Company will give the Union notice of new employees within five (5) calendar days of their employment.

Union Security:  Should Indiana's "Right to work" law (currently codified in the Indiana Code as 22-6-6) be repealed during the term of this Agreement and union security provisions become valid in the State of Indiana, the following clause shall become immediately effective:  All present employees and all newly hired employees in positions currently covered by this Agreement shall, upon the legally effective date of this provision remain, during the continuance of this Agreement or any extension thereof, members of the Union in good standing immediately following a grace period of sixty (60) calendar days from the legally effective date of this provision or the date of hire, whichever is later.

The parties expressly agree that the Union Security clause shall take effect upon repeal of the State of Indiana Right to Work Law.  If the language of the provision immediately above has to be modified to comply with Federal and/of State of Indiana law in order to effectuate the effectiveness of the Union Security clause, the parties agree to meet within a reasonable period of time and make such amendments where appropriate.  And remaining paragraphs remain the same.

SECTION 2.  Check Off. The Company agrees upon written voluntary authorization of any Union members, to deduct from the first paycheck of each month, initiation fees, dues and such other

2

uniform obligations owed to the Union, as may legally be deducted from the first paycheck following the completion of sixty (60) calendar working days of employment. Deductions made in accordance with the foregoing shall be remitted to the Union Officers designated by the Union.

The Union shall, initially, notify the Company as to the monthly sums to be deducted in accordance with the foregoing. Any subsequent change in such amounts shall be certified to the Company in written form over the signatures of duly authorized officers of the Union and shall take effect on the first paycheck following fifteen (15) calendar days after such notification is given.

SECTION 3.  Authorization.

(A)  Voluntary Authorization forms shall be furnished by the Union to the employees. A sample of the Voluntary Authorization form is annexed hereto and made a part hereof and marked Appendix "A".

(B)  If an employee does not have sufficient earnings to pay  his/her uniform obligation to the Union from his/her first paycheck of the month as outlined above, then this amount will be deducted from the first paycheck when he/she has sufficient funds to pay same.

(C)  The Union agrees to hold the Company harmless for any and all claims arising out of this service performed by the Company.

## ARTICLE 4
## UNION REPRESENTATION

SECTION 1.  Employees covered by this Agreement shall be represented by a Union Committee consisting of Local Union President, Vice-President, Financial Secretary, Recording Secretary and a Committeeman from each seniority department, on each shift, as outlined in Schedule "C" of the Contract. These Committee Members shall be selected by the Union from amongst the employees.

The Company agrees to pay the Committeemen for time spent in prearranged meetings. For negotiations, the Company will pay up to four (4) bargaining committee participants for up to five (5) days. For all other prearranged meetings, if the combined time involved in prearranged meetings and work time exceeds twelve (12) hours, time and one-half will be paid in lieu of double time. The Company agrees to pay the Committeemen affected for time spent in all steps of the Grievance Procedure.

SECTION 2.  Contacting Committeemen - The employees covered by this Agreement may, during their working hours, request their respective committee members to contact them, at any reasonable time, during working hours, after approval by their respective Supervisors.

SECTION 3.  Identity - The Union shall furnish the Company written notification as to the identity of the members of the Union Committee, and to keep the Company advised as to any changes.

3

SECTION 4.  International Representation - The Union Committee shall have the right to have present and/or to be represented by a Representative of the International Union in the handling of any matters with Representatives of the Company.

SECTION 5.  International Position – At the request of the Union an employee with one (1) or more years of continuous service shall be granted a leave of absence to assume an office with the Boilermaker's International Union.  The Boilermaker's International Union would assume responsibility for all pay and benefits for this employee, and such leave would be limited to one (1) employee at a time.  An employee on such leave will relinquish any bid held and his/her seniority will be frozen while in this full time position.  Should an employee request to return to Local 1620, such restoration would be within one (1) month of leaving the Boilermaker's International Union office position, and he/she would be classified as Utility with a new established seniority date.

## ARTICLE 5
## MANAGEMENT RIGHTS

The Company shall manage the plant and direct the work force.  Among the exclusive rights of Management, but not intended as a wholly inclusive list of them, are the exclusive rights to plan, direct, schedule, and control the plant operations; to assign work; to transfer; to hire; to promote; to demote; to discipline; to suspend; to discharge for proper cause; to make and enforce reasonable shop rules to carry out the management of the plant; to relieve employees from duty because of lack of work or for any other legitimate reason; and to introduce new production methods, materials, or facilities.  The choice of control and direction of the supervisory staff are vested exclusively in the Company.   The exercise of such Management rights shall be subject to all provisions of this Agreement.

This Agreement is complete in writing.  It may be amended only by an instrument in writing signed by the Plant Manager or authorized representative and appropriate Union representatives.

## ARTICLE 6
## GRIEVANCE PROCEDURE

SECTION 1.  For the purpose of this Agreement, a grievance is defined as a difference of opinion between the Company and the Union, or between the Company and an employee covered by this Agreement, with respect to the meaning and application of the terms of this Agreement.

If a grievance is not filed or appealed on time, it shall be considered dropped.  If the Company does not answer on time, the grievant or Union may elect to have the matter considered at the next step without delay.  All time limits may be extended by mutual written agreement.  In order to be arbitrable, all grievances should contain the following information: aggrieved employee's name or Local 1620, signature and classification, date grievance was filed in writing, date and time grievance occurred, where grievance occurred, description of incident giving rise to the grievance, specific section of Agreement violated, and desired remedy to resolve grievance.

4

SECTION 2. Grievances must be submitted in writing within five (5) business days of occurrence and shall be processed in the following manner:

STEP 1: This written answer will be returned to the Committeeman for acceptance or rejection within five (5) business days. If the Union wishes to appeal the grievance to Step 2, it may do so by rejecting the Supervisor's answer within five (5) business days and presenting the rejected grievance to the Superintendent, Operations.

STEP 2: Once the Superintendent, Operations has given his/her written answer within five (5) business days, and the Union wishes to appeal his/her decision to the third step, this may be accomplished by the Committeeman rejecting the answer within five (5) business days and presenting the rejected grievance to the Plant Manager, or his/her designated representative.

STEP 3: If the Union wishes to appeal a third step answer, it will mark the grievance "rejected" within five (5) business days. Once a third step answer is rejected, the Company will forward a copy of the grievance and all its answers to the International Representative within five (5) business days. Once the International Representative has had a chance to research the grievance, he/she will arrange with the Company to dispose of the grievance in accordance with Step 4 of the grievance procedure.

STEP 4: Upon receipt of the grievance, the International Representative has five (5) business days to arrange a meeting with the Company, resolve the grievance, abandon the grievance, or proceed to Step 5. An extension to any of the above steps must be mutually agreed to, in writing, by both the Company and Union.

STEP 5: Arbitration - If no satisfactory adjustment is agreed upon in Step 4, either party may then request that the matter be submitted to binding arbitration, if so requested within ten (10) business days.

The Company and the Union shall jointly request the Federal Mediation and Conciliation Service to furnish to the parties a panel of seven (7) names from which the arbitrator shall be selected by each party striking in turn a name until one remains. Each party has the right to reject one (1) panel prior to the striking of any names. The Company and the Union will alternate which party strikes first with the party having struck first in the last arbitration striking second in the next arbitration. The Union will start the rotation by striking first in the first arbitration. The award of the arbitrator shall be final and binding upon the Company and the Union.

The expense of arbitration, including the fee of the arbitrator, shall be borne equally by the Company and the Union.

The expense of each party's witnesses will be paid by that party.

The arbitrator may interpret the agreement and apply it to the particular case presented to him/her, but he/she shall however, have no authority to add to, subtract from, or in any way modify the terms of this agreement, or any agreements made supplementary hereto.

SECTION 3.   The Committee shall have the right at all times to have present and/or be represented by the International Representative of the Union in any discussions or negotiations with the Management, and Management shall have the right to counsel at all meetings.

SECTION 4.   The settlement of all grievances affecting wages and rates of pay shall be made effective, in any event, as of the time of original submission to the Supervisor.

SECTION 5.   Strikes and Lockouts - In as much as a procedure has been agreed upon for the settlement of any disputes arising under the terms of this Agreement, there shall be no strikes, stoppages of work, slowdowns, sit-downs, sympathy strikes, or other forms of interference with production during the life of this Agreement or extension thereof.

In the event of any violations of this Section in or about the Company's shop which is unauthorized by the Union, the Company agrees that there shall be no liability on the part of the International or Local Union or any officers or agents, provided that in the event of such unauthorized action, the Union upon notice thereof given in writing by the Company to the Union, meets the following requirements:

(A) That the Union shall within eight (8) hours after notice from the Company, publicly declare that such action is unauthorized.

(B) The Union shall, within eight (8) hours after written notice from the Company, order its members back to work, notwithstanding the existence of any wildcat picket line.

(C) The Union shall not question the unqualified right of the Company to discipline or discharge employees engaging in, participating, or encouraging such unauthorized strike action, except to the grievance procedure.

(D) If it is found that an employee has been improperly discharged or otherwise penalized, the question of reinstatement with or without loss of seniority and/or back pay shall be determined by recourse to the grievance procedure.

The Company shall not engage in any lockout of its employees during the life of this Agreement or extension thereof.

SECTION 6.   Employees must at all times abide by plant regulations, provided plant rules or regulations do not conflict with the terms of this Agreement.  Violations of such rules or regulations may be just cause for discipline or dismissal, with the right of appeal in accordance with the provision of the following paragraph.

SECTION 7.   No employees shall be discharged, suspended or otherwise penalized without recourse to a fair hearing before the Plant Manager of the Company.  If it is found that an employee has been unjustly discharged, suspended or otherwise penalized, or improperly laid off, he/she shall be reinstated immediately and compensated in full for any wage loss resulting from same.

SECTION 8.   Any employee called to the office concerning Union business, such as disciplinary matters, grievances, seniority, bypassing or withdrawing from classification or other Union matters must be accompanied by their Committeeman.  For personal non-union business, this

6

Union representation is unnecessary. If a Committeeman has a personal grievance it is to be presented by another Committeeman. All agreements shall be null and void without a Committeeman present.

## ARTICLE 7
## WORK WEEK AND OVERTIME

SECTION 1. The established workweek under this Agreement shall consist of five (5) days of eight (8) hours each, Monday to Friday, both inclusive. The third shift work week will be Sunday through Thursday.

SECTION 2. Time and one-half shall be paid for all work performed in excess of eight (8) hours in any one (1) day, and for all work performed on Saturday.

SECTION 3. The starting time of all shifts shall remain as now in effect, unless otherwise agreed to between the Company and the Union.

SECTION 4. Employees working required or voluntary overtime will not be laid off during the regular work schedule to equalize the time. Overtime shall be applied as follows:

(A) Production unit
(B) Classification
(C) Department
(D) Bargaining unit

Where production exists within a department, on overtime, all employees not scheduled to run production will be offered overtime, as required, on a rotating basis. This rotating of overtime will be among all remaining departmental employees by shift. Utility employees accepting production unit overtime prior to a shift will not be displaced at the start of a shift by an employee with more seniority. The exception would be an employee's bid unit, or where classification seniority is applicable. To be eligible for Saturday, Sunday, and holiday overtime, the employee must have worked the last scheduled workday prior to this premium day. Exceptions to this are days missed due to contractual jury duty, bereavement, or if the day before the Saturday, Sunday, or holiday is missed due to vacation day(s). Employees will be required to notify the Company of his/her desire to work overtime if any of these exceptions occur. Any employee who wishes to claim failure to offer overtime in violation of this section must do so in writing within one (1) working day of the disputed overtime assignment. If he/she prevails, the exclusive remedy is to be awarded the next similar overtime assignment for which he/she is qualified.

SECTION 5. Double time only shall be paid for all work performed on Sundays and for all work performed in excess of twelve (12) hours in any one (1) scheduled workday.

SECTION 6. All employees will be entitled to one (1) fifteen (15) minute break before lunch and one (1) fifteen (15) minute break after lunch. These breaks differ for "hot" forging employees where the breaks vary depending on production vs. those "cold" forging employees, where breaks are more regulated within their respective departments. Additionally, there will be one (1) eighteen minute lunch break per shift for all employees.

7

Production work scheduled on Saturday or Sunday will be posted no later than 1:00 P.M. the preceding Wednesday and daily scheduled overtime will be posted by the end of the shift of the preceding day.  Any work scheduled on a holiday will be posted not later than 8:00 A.M., two days in advance of the holiday.  Exceptions may be made in uncontrolled emergencies, which would be agreed to with two (2) committeemen, one (1) of whom is from the department and shift affected.

## ARTICLE 8
## ALLOWED TIME CLAIM

SECTION 1.  Employees who are regularly scheduled to report for work shall be paid, in the event no work for which they were scheduled to report is available, for four (4) hours work at the rate in effect for the occupation at which they were scheduled to report.  At the Company's discretion, the employees scheduled to report may be assigned to other work for which they may be qualified in lieu of their being released, for which they will be paid the rate of the job on which they were scheduled to report for four (4) hours after which they will be paid the rate of the job to which they are assigned if the employee voluntarily disqualifies himself (bypass, withdraw, bid, etc.).  Employees reporting for work late will be subject to general department or bargaining unit work
assignment, in lieu of replacing an employee assigned in his/her place.

SECTION 2.  Employees who are scheduled to report and actually begin work at the start of the turn, and work less than four (4) hours because their regular work becomes unavailable, and are reassigned to other work shall be paid for a minimum of four (4) hours at the rate in effect for the occupation at which they began work.  Employees may be assigned to work beyond the four (4) hour period, and employees so assigned to other work shall be paid for the actual hours worked at their rate of pay unless they disqualify themselves.  Employees assigned to work on a higher rated job than that for which they reported shall receive the higher rate for the time they spend on the higher rated job.

SECTION 3.  Allowed time (where no work is performed) under the foregoing provisions shall not be included in the hours during the workday or week for the purpose of calculating overtime and likewise shall not be paid at overtime rates.  Hours actually worked under the foregoing provisions shall be paid at overtime rates only when they constitute overtime under the provisions of this Article.

SECTION 4.  The pay for allowed time shall be at the regular rate of pay for occupation at which the employee reports for work, or on which the employee has begun work in accordance with the provisions of Section 1.

SECTION 5.  The provisions of this Article do not apply in the event that:

(A)  Strikes, work stoppages in connection with labor disputes, or failure of utilities or acts of God interfere with work being provided or;

(B)  An employee is not put to work or is laid off after having been put to work, either at his/her own request or due to his/her own fault, or;

(C)  The Company will give the earliest possible notice, but not less than two (2) hours of a

8

change in schedule or reporting time that the employee scheduled or notified to report for work need not report.

SECTION 6.  All employees are to furnish the Human Resources Department of the Company with a current phone number to receive information concerning their work schedule and contact with this number will thereby relieve the Company of any call-in pay obligations to the individual employee concerned.  An employee absent from work because of vacation or extended illness will be required to notify the Company prior to his/her return as to his/her work status.

SECTION 7.  Any employee failing to notify the Company prior to the starting time of his/her shift, of his/her inability to be at work or absent without just cause, will be subject to disciplinary action and forfeit any claim to call-in pay upon reporting to work following his/her absence.

SECTION 8.  Any employee leaving the plant during a work shift must scan their I.D. card and notify their Supervisor of the reason for leaving work.  If the reason is not justifiable the employee will be subject to disciplinary action.

The foregoing provisions of Article 8 in no way affect Article 10 (Transfers to Facilitate Production or to Utilize Employees' Skills).

## ARTICLE 9
## SENIORITY PROCEDURE

SECTION 1.  New employees shall not be considered regular employees until after they have accumulated sixty (60) working days of service and they may be laid off or discharged at any time, with or without cause, during this probationary period.  After a new employee has accumulated sixty (60) working days of service, he/she shall be considered a regular employee and shall be entitled to seniority credit for the time spent during this probationary basis.

SECTION 2.  Seniority shall be confined to the bargaining unit and in the reduction or restoration of forces, ability being sufficient to be applied in the following order:

(A)  Production unit
(B)  Classification, by bid shift, if applicable
(C)  Department, by bid shift, if applicable
(D)  Bargaining Unit, by bid shift, if applicable

The employee applying classification seniority will bump the youngest employee in his/her classification on his/her bid shift.

NOTE:    All employees, who have accumulated 400 hours worked in their current classification will be credited with classification seniority.  Employees who have not attained the required 400 hours shall be credited only with the hours they have actually worked within their current classification.  These employees shall be given seniority in the last classification in which they have fulfill the 400 hours.

An employee shall have the option of exercising seniority in the following order:

9

    (1) By classification
    (2) By department
    (3) By bargaining unit

SECTION 3.  In the event of a depression in trade, the employee with the shortest term of service in the classification shall be removed from the classification, and shall then exercise his/her departmental seniority, any employee removed from a department by reason of insufficient departmental seniority shall then have the right to exercise his/her seniority in the bargaining unit. When a unit, that is scheduled for more than one (1) shift is reduced to two (2) or one (1) shift because of a reduction of forces, the senior employees, in the classification affected, shall retain their job on the unit as long as there are no other employees laid off that have more seniority within the classification.   In restoration of forces, employees will be restored to the classification and/or department they held prior to the reduction in forces in reverse order of the foregoing.

SECTION 4.  The Company shall prepare seniority rosters for each department, setting forth thereon the bargaining unit-wide departmental and classification length of service date.  Such rosters shall be corrected every six (6) months and the Committee furnished with four (4) copies thereof.  The names of new employees shall be added to such seniority rosters as they complete their probationary period in the service of the Company.

SECTION 5.  LOSS OF SENIORITY.  The seniority of an employee shall be considered terminated in case of:

(A)  Voluntary resignation

(B)  Justifiable discharge

(C)  Employee's failure to return to work after lay off within five (5) days after being notified by registered mail (return receipt requested) sent to his/her last known address appearing on the Company's records provided, this time shall be extended for justifiable cause, such as illness or injury, if the employee is unable to report for work and so advises the Company within two (2) work days after receipt of said notice.

(D)  Any employee, who having been granted a leave of absence, engages in any gainful employment elsewhere during said leave of absence, or who shall be on leave of absence more than ninety (90) consecutive days, unless special provisions shall have been made therefore by agreement between the Company and the bargaining committee.

(E)  Any employee laid off due to business conditions, will be dropped from the payroll and seniority roster when the layoff time equals one (1) year or the amount of seniority as shown on the roster at the date of lay off, whichever is the greater, subject to a maximum of five (5) years, effective with employees laid off after March 1, 1980.

(F)  For an employee on disability leave, the Company will keep the employee on the seniority rolls for a maximum of five (5) years.  If the employee is unable to return to work after five (5) years have lapsed since last worked for the Company, he/she will be terminated as an employee.

10

(G) Any employee who is on disability leave exceeding fifty-two (52) weeks must relinquish all outstanding bids held, and may not bid again until able to return to work.

(H) Any time the Company has advance knowledge of necessary lay off, the affected employee will be notified as far in advance as possible.

SECTION 6.   Employees transferring from the Blacksmith bargaining unit to another bargaining unit will thereby relinquish any and all claim to seniority rights within the Blacksmiths unit.

SECTION 7.  In the event an employee bids to another unit within his/her own classification, his/her seniority rights within the classification shall remain unchanged and any subsequent claims to the unit transferred from, shall be relinquished.

SECTION 8.  Employees in this bargaining unit who are promoted to non-union jobs shall retain seniority while outside the bargaining unit for up to six (6) months, after which time they lose their seniority and have no recall rights.

SECTION 9.  Any deviation which may arise from time to time in regard to conditions of this Article must be agreed to between the Company and the Union before becoming effective.

SECTION 10.  Production unit seniority will be processed as follows when:

(A)  Production unit down due to business conditions or a change in production schedule:

    1.   The crew involved to accept available work assignment if the shut down occurs during the day.

    2.   If the Company schedules another production unit that is open, this crew will be scheduled on the open unit.  Except if there are employees working within their classification on other units or eligible to work within their classification when their own unit is scheduled, then these employees will be assigned their respective jobs on the open unit the following work day.

    3.   If any member of the crew decides to exercise his/her rights and by-pass his/her seniority within their classification, then he/she would apply department seniority. The bypassed employee would not apply classification seniority again until his/her production unit was rescheduled, or 60 calendar days passed since the bypass was signed.  At this time, the bypassed employee would notify the Company of his/her desire to bump back into his/her classification, or remain on the bypass for another 60 calendar days.  If the employee should decide to bypass both classification and department seniority, the same procedure described above would apply.

    4.   An employee may by-pass an open unit, or his/her bid unit on a different shift, if there are qualified employees as determined by the Company, available to run the unit.

    5.   Prior to the end of a work week (Friday), employees have the right to exercise

11

unit or classification seniority on week long vacancies. After the first scheduled shift of the week starts, subsequent moves will be processed according to subsection (B).

(B) Production unit down due to breakdown of equipment or temporary shortage of material:

    1. Exercise of seniority by the crew members affected by the breakdown or shortage of material will be processed according to the above subsection "A", except that employees affected by the terms of sub-section "A-2" would be rescheduled the following work week instead of work day, if the situation would continue.

    2. If there are no open units to schedule the crew on, the members of the crew may be scheduled on other work the day following the breakdown and will apply seniority the second day following the breakdown.

    3. If an employee is needed in a particular classification and there is an employee working in the department who is in this classification and available, he/she should be used ahead of other employees carried as "Utility", regardless of their seniority. This would not apply to an employee who has bypassed his/her classification seniority. This would not apply to an employee during a work shift but at the start of the shift or the following workday if the situation should continue.

    Employees who may be affected on units due to change in methods of production on a day by day basis, will be retained on their current shift as Utility and used in accordance to their seniority, and qualifications on job assignments. Utility employees with two (2) years or more seniority will have their choice of daily job assignments. This would also apply to employees who have bypassed their classification. The intent of this section is that if a production unit is down at the start of the shift, crew members should be used ahead of Utility employees working in their classification for that day. If the breakdown should continue the following day the members of the crew would continue to be used ahead of Utility employees in their classification. If there are no Utility employees working in their classification, they may be offered other work. If this breakdown continues on to the second day, all members of the crew can exercise classification seniority.

    4. When the unit is expected to run later in the shift, employees are not to be re-assigned for sixty (60) minutes. This does not preclude them from performing miscellaneous duties around their production unit.

(C) Employees will maintain their bid rate for every hour worked until they voluntarily remove themselves out of that classification by bidding off another classification or by bypassing, at which time they shall take the new rate. If the employee applies classification seniority, they receive the higher of their rate or the new rate.

(D) Assigned Employees - Employees working as Utility, or outside of their classification may accept jobs on assignment on a weekly basis. These assigned employees will remain on the job until they notify the Company at the conclusion of a work week that they request

being taken off the job or at such time that a more senior employee wants to accept this job on a weekly assignment effective the following Monday. Should classified employees become available they may bump Utility or assigned employees at the start of a work shift.

SECTION 11. All work coming under the jurisdiction of the Boilermakers and Blacksmiths shall be performed by members of this bargaining unit.

## ARTICLE 10
## TRANSFERS TO FACILITATE
## PRODUCTION OR TO UTILIZE
## EMPLOYEES' SKILLS

SECTION 1. In the event it becomes necessary to temporarily assign production employees, the junior employee in the classification on the shift from which the transfer is being made will be transferred unless such transfer would interfere with production, in which event, the Company shall notify the Union Committeeman of the reason for the selection of another employee: provided however, that where the transfer is being made to utilize special skill, the Company may transfer any employee with such skill.

When transfers are made to facilitate production or to utilize employees' skills, the employee will receive the base rate of the job vacated or the base rate of the job to which transferred, whichever is higher. A transferred employee will have the option to return to a position held before a transfer at the end of a shift. Shift supervisors, if possible, may transfer employees back during a shift. Employees transferred for an entire work week or longer will return to the position held prior to a transfer at the beginning of a work week, and not during a week.

SECTION 2. The foregoing provisions of Article 10 in no way affect Article 8, Allowed Time Claim.

## ARTICLE 11
## JOB BIDDING PROCEDURE

SECTION 1. All jobs shall be posted unless agreed on by the Company and the Union. All successful bidders shall be posted. All classifications in the contract will be held by members of Local 1620. Job vacancies will be posted for three (3) consecutive work days describing the job vacancy and listing the department and shift for a period which will start with the date posted and bidding will be closed at the expiration of the bidding period.

The following Cutting Department positions will be posted together as one (1) unit.

(A) 900 – 1 and 2 Band Saws
(B) Band Saws
(C) Carbide Saws
(D) High Speed Saws – requires two (2) bid operators

SECTION 2.  Seniority recognition in bidding on job vacancies shall be applied by bargaining unit seniority as follows:

(A) First -- Choice will be given to either employee in the classification, or employees who have previously successfully worked the classification 400 hours, or to employees who have five (5) years or more continuous seniority in the bargaining unit.  An employee receiving a job on the basis of five (5) years seniority will be subject to the terms of Article 9, Section 2, referring to fulfilling the 400 hours within the classification.  Also, a five (5) year employee who has never held the classification has an eighty (80) hour try-out period.

(B) Second -- If the job vacancy is not filled in the above procedure, then bargaining unit seniority will apply in selection of the successful bidder.

(C) Third -- If the job is not filled in the above manner, the job will be filled at the discretion of the Company until the job can be filled on a permanent basis by members of Local 1620 only.

SECTION 3.  Employees who have previously bid and worked successfully 400 hours in a classification would not be under a bidding restriction.  Only employees who have not previously bid, and worked successfully 400 hours in a classification, would be under a bidding restriction.  This bidding restriction would last until the 400 hours is completed.

Employees withdrawing from a classification would have a thirty (30) day bidding restriction, unless all other applicants are also within the thirty (30) day bidding restriction, in which case the senior employee would get the job.

The senior employee bidding will be given eighty (80) working hours to qualify.  Such employee can disqualify himself/herself during this period.

(A) If the bid is made outside of the employee's classification, he/she shall retain seniority in the classification bid from for an eighty (80) working hour period.  If the employee does not request return to his/her original classification, prior to the completion of the eighty (80) working hours period and upon showing sufficient progress, he/she shall be re-classified in his/her seniority and the new classification will be retroactive to the date of bid.

(B) Exceptions to this rule for the extension of time may be made, but only by agreement between the Company and Union.

SECTION 4.  If an employee who has been removed from a job classification, bids on a job vacancy, he/she will be considered as bidding from the classification he/she held prior to the removal.

**ARTICLE 12**
**JOB VACANCIES**

14

When a new job is created, the Company will describe the duties of the job and negotiate the rate of pay.  If there is a disagreement, the Union has recourse through the grievance procedure.

## ARTICLE 13
## VACATIONS

The following is a schedule of vacation time off with pay each employee is entitled to in his/her years of service with the Company:

|          |         | Single-Day Eligibility |
|----------|---------|:----------------------:|
| 1 year   | 5 days  | **5**  |
| 2 years  | 8 days  | **8**  |
| 5 years  | 10 days | **10** |
| 10 years | 15 days | **10** |
| 15 years | 17 days | **12** |
| 20 years | 20 days | **15** |
| 25 years | 25 days | **20** |

Employees hired after May 1, 2017 will be capped at twenty (20) days.

Vacation pay will be computed by multiplying the employee's current bid rate times eight (8) hours per day of vacation taken.

Employees shall specify preference for vacation periods prior to March 1st of the current year. Employees requesting their vacation preference prior to March 1st will be approved on a seniority basis.  Employees requesting their vacation preference after March 1st will be on a first come, first served basis.  If no vacation preference is scheduled, the Company will schedule their vacation time at the vacation shutdown period.

The final right to schedule vacation periods and the change of such periods is exclusively reserved by the Company.  Employees will have the right to schedule their eligible time in accordance with the single-day schedule listed above.  Those with fifteen (15) days of vacation or more will be required to take a minimum of one (1) 5-day-group vacation.  Vacation requests must be received two (2) weeks in advance, and receive supervisor approval.

Should the Company require the services of any employee during said vacation period, seniority shall be the controlling factor in the classification needed.

All vacations are to be taken in five (5) day groups with the following exceptions:

1)    As outlined in the schedule relating to single-day eligibility.

2)    Vacation days taken during the week in which a holiday falls will not be considered single days – provided the employee is off the full week.  This applies to all employees with ten (10) or more days of eligibility.

Any employee actively working during the current year would be eligible for vacation pay in that year. The Company will guarantee that active employees will receive all paid vacation days due them during the current year.

In case of death of an employee who is eligible for vacation pay in accordance to foregoing provisions, the vacation pay will be paid to legal heirs.

## ARTICLE 14
## SHIFT DIFFERENTIAL

Shift differential payments to be paid as follows: the second shift to receive twenty-five (25) cents per hour or five percent (5%) of earnings, whichever is the lesser. The third shift to receive fifty (50) cents per hour or ten percent (10%) of earnings, whichever is the lesser.

Shift differential will be included in vacation pay calculations for employees working second or third shift at the time of their scheduled vacation.

## ARTICLE 15
## TIME KEEPING PROCEDURE

It is the prerogative of the Company to determine and institute accurate time keeping procedures; also, to change systems and procedures if necessary to achieve the required accurate information for the proper payment of work performed and management of the Company business.

Each employee is responsible for scanning his/her proper work time into the Company's time and attendance system. In cases of emergency the Supervisor would authorize and verify time information that would be required.

With our present system, the responsibility for the accuracy of time and information on the job or production unit cards concerning the production unit performance is the production unit operator.

In some instances the production unit operator may authorize other members of the crew to clock the job cards; however, he/she is responsible for their actions.

Trim Press Operators on production units are responsible for the information on the job card in regard to their die change procedure.

Information in regard to work performed on individual operations, such as, cold trimming, reaming, coining, etc., is to be recorded by the individual concerned, as required by Management.

## ARTICLE 16
## INSURANCE

SECTION 1.  Effective January 1, 2018, employees shall become eligible for the Medical and Dental Plans, on the first of the month following sixty (60) calendar days from employee's date of hire. Qualified bargaining unit employees will be allowed to join and participate in such Plan(s) in the same manner as salaried employees and under the terms and conditions set forth in said Plan(s), or as subsequently amended, altered, and/or revised from time to time by the Company. Said coverage and benefits are also subject to the terms and conditions contained in any contracts between the Company and any insurance carrier, provider, or third party administrator. The Company shall have the right to change the third party administrator of the benefits. No Company action respecting said Plan(s) nor any dispute arising out of, under or relating to said Plan(s) shall be subject to the Grievance or Arbitration procedures under this Agreement.  Any change in coverage and benefits and/or any changes in contributions, premiums, deductibles or plan design which may occur in the Medical and Dental Group Insurance Plan(s) during the term of this Agreement will be applied to the bargaining unit employees on the date or dates that such changes become effective for the salaried employees.

A) Insurance charges are subject to a yearly review and any increases or decreases that may occur during the life of the Agreement will be applied to bargaining unit employees in the same manner as salaried employees to include employee contributions. The amounts established by the Company shall be communicated to the Union and shall not be subject to review under this Agreement's grievance procedure.

B) In case of layoff, termination or other cessation of active employment, Medical and Dental insurance coverage will be discontinued on the last day of the month in which the employee stops working. All other benefits terminate immediately upon cessation of active employment.

C) The Company shall provide basic life and accidental death & dismemberment insurance in the amount of one times the employee's base salary. Such coverage is subject to the terms and limitations as set forth in the governing plan documents. For hourly employees, the term "base salary" shall be defined as 2,080 times the employee's regular rate of pay.

D) Voluntary.  Employees shall be permitted to purchase the following types of insurance at the employee's expense:

    a. Long Term Disability
    b. Vision
    c. Supplemental Life (Employee) Life Insurance for Spouse
    d. Life Insurance for Child(ren)
    e. Personal Accident

1.

Allegheny Technologies Incorporated may amend, change or terminate the voluntary benefits in the flexible benefits package at any time, at its sole discretion, without prior consultation with the Union.  Personal Accident Insurance, Flexible Spending Accounts, Optional Life, Spouse Life, Child Life, Long Term Disability, and Vision Insurance are considered voluntary benefits.

SECTION 2. Employees may utilize the ATI Benefits Center for plan highlights and must contact the ATI Benefits Center for enrollment and/or life event changes through the methods established by the

17

Company. The Company will provide computer access for employee use and administrative help for employees who request it.

SECTION 3. Health care benefits added as a result of the HCRA may be removed from this contract if the act is rescinded during the life of the contract.

Employees on occupational or non-occupational disability continue all elected coverages for fifty-two weeks, and are required to pay their portion of the premium. If an employee is unable to return to work, medical/dental coverage would be available through COBRA.

SECTION 5. Employees will be eligible for up to twenty-six (26) weeks of Short Term Disability benefits. The benefit amount will remain at $405/week through December 31, 2017. Effective January 1, 2018, the benefit amount will increase to $430/week.

SECTION 6. Insurance coverage (life and medical) will continue to be provided for all retirees who retired prior to May 1, 1992. Future retirees (retiring after May 1, 1992) who were hired prior to May 1, 1989 and who retire at age sixty (60) or over will have no company paid life or medical coverage upon retirement. These retirees will receive three hundred forty dollars ($340) per year of credited service. This benefit will be paid as a lump sum upon retirement. In case of death of an employee who is eligible for this benefit in accordance to the forgoing provisions, this benefit will be paid to legal heirs. The retiree may then choose to purchase five thousand dollars ($5,000) life and/or the medical coverage provided at the time of retirement by paying the full cost of these benefits to the ATI Benefits Center. Employees hired after May 1, 1989 will not be entitled to these benefits upon retirement.

SECTION 7. The above insurance employee contribution change and lifetime maximum change will be effective with insurance plan year beginning January 1, 2018, all other changes are effective May 1, 2017.

## ARTICLE 17
## PENSION PROGRAM

SECTION 1. The pension program placed into effect by the Company May 1, 1960 (the "Defined Benefit Plan"), is hereby acknowledged as a part of this Agreement, and will remain in effect for participants in the Defined Benefit Plan as of May 1, 2017. The Defined Benefit Plan will be eliminated for employees hired after May 1, 2017, and will be replaced with the matching contributions set forth in Section 5.

SECTION 2. The current pension program will be improved in the following manner:

(A) In the case of any participant whose Normal Retirement Date is May 1, 2008, or after, the service multiplier will be $35.00 per credited year of service for service earned through April 30, 2008. The service multiplier for service earned May 1, 2008, and after, will be $40.00 per year of credited service.

(B) Twelve hundred (1,200) hours constitutes a pension year.

18

(C) If a participant in the pension plan dies before actual retirement, but after reaching      five (5) years credited service, his/her surviving spouse will receive either the Automatic Surviving Spouse Benefit or the Voluntary Pre-Pension Spouse Benefit (depending upon the option that has been selected). If the Automatic Surviving Spouse Benefit has been selected, the surviving spouse will receive 120 monthly payments, or the estate if a death occurs prior to the expiration of the payments. The amount of these payments will be equal to what the spouse would have received had the participant retired the day before his/her death and elected a ten (10) year certain annuity.

    (D) Time lost due to jury duty, work connected injury, holidays, vacation, bereavement time, and up to three (3) weeks illness while under doctor's care are to be included in credited hours of service.

    (E) Employees are eligible to receive a disability pension benefit if all of the requirements as listed in the Portland Forge Hourly Pension Plan document are met.

    (F) Effective May 1, 1998, active participants in the Portland Forge Hourly Pension Plan will not be charged for the qualified pre-retirement survivor annuity benefit.

    (G) Eligible employees retiring on or before December 31, 2018 will receive a lump sum payout of $4,000 upon retirement. To be eligible for this payment, an employee must be at least fifty (50) years old with at least fifteen (15) years of service. Payment will be made in the retiree's 401k account.

SECTION 3. All rights, benefits, limitations, and conditions of eligible employees shall be governed by and be subordinate to the terms and provisions of the official pension plan document. These terms and provisions shall be in compliance with the Employee's Retirement Income Security Act of 1974 (ERISA) and all other applicable laws. The Company may make such changes as are necessary to comply with these laws or to remove doubts about compliance.

SECTION 4. The Company will offer the corporate-wide 401k Plan provided by Allegheny Technologies Incorporated. Allegheny Technologies Incorporated may amend, change or terminate the 401k Plan at any time at its sole discretion without prior consultation with the Union. The official document entitled "Allegheny Technologies Incorporated 401k Retirement Plan", which is filed with the Internal Revenue Service and which is available from the Company, states all of the terms and conditions of the 401k Plan. All rights, benefits, limitations and conditions of eligible employees shall be governed by and be subordinate to the terms and provision of that document, provided, however, after amending the document entitled the "Allegheny Technologies Incorporated 401k Retirement Plan" with respect to employees covered by this agreement effective May 1, 2017 through April 30, 2021, the Company shall not, either terminate or alter the rate of Company contributions under the Plan without bargaining to an agreement any termination or alteration of contribution rates with representatives of the collective bargaining unit covered by this agreement.

The Company will provide a 100% match of employee contributions up to a maximum of $1,000 per year effective July 1, 2005. Also, the Company will make a contribution per quarter to employees' 401k accounts of $ .25 per hour worked per quarter effective July 1, 2005.

19

SECTION 5.  The retirement benefit for all employees hired on or after May 1, 2017 will be a 401k Plan with the following features:

- The Company will automatically enroll employees into the 401k Plan with employee contributions set at 3% of earnings.
- The Company will provide a 100% match on the first 3% of employee contributions.


### ARTICLE 18
### HOLIDAY PROGRAM

SECTION 1.  A holiday allowance will be paid by the Company for the following holidays: the day before New Year's Day, New Year's Day, President's Day, Good Friday, Memorial Day, Independence Day, Labor Day, Veterans Day, Thanksgiving Day, and the day following Thanksgiving, the day before Christmas, Christmas Day.  All holiday allowance to be paid with the week in which the holiday falls.  If any of the above holidays fall on Sunday, the next day shall be observed as the holiday.  If any holiday falls on a Saturday, the holiday will be observed the preceding Friday.  Any employee working on any of the above holidays will receive double time pay in addition to his/her regular earnings for that day.

The President's Day holiday is a floating holiday during a calendar year.  The placement of this holiday each year will be mutually agreed to with the Company and the Executive Committee of Local 1620.  If no appropriate floating date can be agreed upon between the Company and the Executive Committee, the President's Day holiday will be observed on the original assigned date in February.

SECTION 2.  The holiday allowance shall be paid for the above listed holidays whether worked or not shall be in amount equal to eight (8) times the employee's current classification or hourly rate, but in no case will they receive less than the Utility rate.

(A)  New employees not yet members of Local 1620 will receive holiday pay during    their sixty (60) day probationary period.

(B)  No holiday allowance will be paid an employee who has not earned any wages from the Company during the week the holiday falls in, unless the failure to work was due to industrial accident, a scheduled vacation or because of a doctor's verified illness or hospitalization, or due to death in the immediate family.  Employees must work their scheduled days before and after the holiday to be eligible for holiday pay.

(C)  No holiday allowance will be paid to any employee who has been directed and agreed to work on a holiday but has failed to report to work without reasonable cause.

(D)  Any employee working on a holiday will be paid in accordance to the contract governing holiday pay.  The Company will solicit volunteers to work on a holiday.  If there are insufficient volunteers, the Company will follow the overtime process for forcing the junior employee(s).

## ARTICLE 19
## BEREAVEMENT PAY

An employee who requests to take time off due to the death of an immediate family member must notify his or her Supervisor, or the Human Resources Department immediately.  The employee must provide verification of need (obituary, death certificate, etc.)

Bereavement pay is calculated at eight (8) hours per day based on the employee's base pay rate at the time of absence and will not include any special forms of compensation, such as incentives, overtime or shift differentials.

The bereavement period would be from four (4) days immediately preceding the day of the funeral until four (4) days immediately following the day of the funeral.  An employee may, with his or her Supervisor's approval, use any available vacation as the vacation policy will allow to schedule for additional time off as necessary.

Paid bereavement is granted according to the following schedule:

Employees are allowed up to three (3) consecutive days off from regularly scheduled duty with regular pay in the event of the death of the employee's spouse, child, mother, father, sister, brother, current mother-in-law and father-in-law, grandparent, all grandchildren, and current stepfather, stepmother, stepbrother, stepsister, stepson, stepdaughter, and step grandparent.

Employees are allowed up to two (2) days off regular scheduled duty with regular pay in the event of the death of the employee's current brother-in-law, sister-in-law, son-in-law, daughter-in-law, and spouse's grandparents.

## ARTICLE 20
## JURY DUTY PAY

Any employee subject to Jury Duty will be paid the difference between jury duty pay and his/her regular earnings.  The calculation of his/her regular earnings shall be based on his/her current hourly rate for an eight (8) hour day or a forty (40) hour week.

Employees released from Jury Duty who have served more than four (4) hours will not be required to return to work in order to be eligible for Jury Duty pay under the provisions of this Article. There will be no pyramiding of payments.

This section shall apply to any employee who is subpoenaed as a witness.  Any employee would not be eligible for pay for being subpoenaed as a witness if the subpoena resulted from other paid employment, such as an expert witness that pertains to traffic violations.

## ARTICLE 21
## PAYCHECKS

Employees will be compensated on a bi-weekly basis via direct deposit every other Friday, The Company will provide at least ninety (90) days' notice for the transition to bi-weekly pay and the

conversion to direct deposit. The Company will provide (30) days' notice should the Company wish to change the payroll week.

## ARTICLE 22
## MILITARY SERVICE

The Company will follow federal obligations as required under the "Uniformed Services Employment and Reemployment Rights Act of 1994", and the Allegheny Technologies Incorporated Military Leave Policy.

## ARTICLE 23
## PLANT SAFETY

SECTION 1.  The Company and the Union will constantly cooperate with each other to attempt to eliminate all accidents and health hazards.

Whenever the Union Committee or Safety Committee becomes conscious of conditions that can jeopardize the safety or health of employees, they are to immediately advise the responsible Supervisor of the department for corrective action.

In the event that it is the opinion of the Union Committee and Safety Committee that a production unit is not safe for operation the responsible Supervisor of the department is to be immediately contacted.  If it is impossible for the Supervisor to resolve the problem to the satisfaction of the Union Committee or Safety Committee, then the Superintendent, Operations is to be immediately contacted for his/her possible resolution.

The Superintendent, Operations, with the Union Committee and Safety Committee representative, will then thoroughly investigate the equipment concerned and resolve the issue by a mutual agreement which is in the best interests of both the employees and Company.

SECTION 2.  Suction fans and blowers shall be provided to carry off grinding dust, smoke, and fumes, so as to maintain healthful atmospheric conditions throughout the plant during all shop working hours.

SECTION 3.  First aid equipment shall be maintained with a competent attendant in charge and on duty during all shop working hours.  A safety committee composed of equal representation from Management and the Union shall function in the interests of maintaining conditions of safety in the plant.

## ARTICLE 24
## SANITATION

22

Sanitary toilets, proper lighting and heating conditions shall be provided and maintained by the Company.

### ARTICLE 25
### UNION MONTHLY
### MEMBERSHIP MEETINGS

Paid time off will be allowed to local lodge officers/committee persons, once per month for a total of nine (9) hours, , for regularly scheduled monthly Union meetings, unless the Company is notified otherwise by the Local President.

If extra time should be necessary for the monthly meeting, the Union will notify the Company to this effect. All other meetings must be with mutual agreement.

### ARTICLE 26
### MISCELLANEOUS PROVISIONS

SECTION 1. Equipment operators are required to lubricate their machines as needed.

SECTION 2. An employee may be added at the Operator's/Supervisor's discretion when cutting stock on shears, or saws when billet sizes limit the speed of the operation.

SECTION 3. The Company will provide Personal Protective Equipment (PPE) required for the position.
(A)     Prescription Safety Glasses. The Company will provide to employees who require prescription lenses and initial pair of prescription safety glasses. Whenever such glasses need replaced due to a change in prescription or normal use, wear and tear, the Company will provide suitable replacements, provided the old pair is returned to the Company. Employees who lose their Company-provided glasses will be responsible for purchasing replacements.
(B)     Safety Shoes. The Company will provide each employee with an initial pair of safety shoes from a Company-approved vendor. The Company will provide replacement safety shoes every eighteen (18) months or whenever such shoes need replaced due to normal use, wear and tear, provided that the old pair is returned to the Company. Employees who lose their Company-provided shoes will be responsible for purchasing replacements. The Company-approved vendor will offer a variety of options providing sufficient protection.

SECTION 4. When, in the event Management determines that the requirements of production will permit, employees will, on request, be granted a leave of absence of thirty (30) days or less, subject to renewal, not to exceed a total of ninety (90) days without prejudice to their seniority status, provided this time may be extended for justifiable cause, such as, illness or injury, by agreement between the Company and the Bargaining Committee. All leave of absence procedures shall be in writing.

SECTION 5. Employees, who, because of old age or injury, become unable to handle their regular work to advantage, shall be given preference to such work as they are able to handle,

23

maintaining their bargaining unit seniority on such assignment unimpaired.  Such assignment and rates of pay, therefore, shall be by agreement between the Company and the Union.

SECTION 6.  No Heat Treat Helper will be required to operate more than two (2) presently installed machines, but if future technology permits, they may be required to run more machines.

SECTION 7.  Electric mules will be used for moving material in areas such as the inspection building and heat treat department.  Employees may move material in and out of the inspection building to and from the storage areas north of the building.   The heat treat department includes storage areas outside the north, east, and west sides and south to the maintenance building, plus the magnetic particle inspection building.  These conditions will remain as long as these structures are unchanged.

SECTION 8.  The Company will make every effort to have work performed inside during inclement weather conditions.

SECTION 9.  Members of Local 1620 will be required to operate mobile manipulators in the new 35,000# hammer operation to heat, forge, trim inspect, and store forgings.

SECTION 10.  The training of new operators will normally take place on first shift, where additional instruction and supervision are available.

SECTION 11.  On a routine basis, the lighting of furnaces prior to a shift in all departments will be Local 1595 work.  This routine basis will include at least one (1) electrician.  Properly trained members of Local 1620 and Management employees may light furnaces when an urgent need arises without calling a member of Local 1595.  Furnaces going out during a shift or a unit starting during a shift may be lit by any properly trained ATI Portland Forge employee.

SECTION 12.  Employees will be expected to load the furnace for the next shift.

SECTION 13.  Neither the Company nor the Union will unlawfully discriminate against any employee in the bargaining unit because of age, race, color, creed, gender, marital status, national origin, religious belief, disability, sexual orientation (which includes gender identity),  veteran status or any other unlawful reason.  Without limiting the Company's rights under this Agreement, it specifically has the right to take action necessary to comply with the Americans with Disabilities Act or to remove any doubt as to compliance.  Such action may include accommodating qualified employees with disabilities, even though such accommodation is not offered to other employees covered by this Agreement.


### ARTICLE 27
### WAGES

All changes affecting hourly rates are listed in Schedule "A."

## ARTICLE 28
## CONTRACT DURATION AND TERMINATION

SECTION 1. Any provisions of this Agreement which may be in conflict with any Federal or State Law or Decree shall be, and hereby is, modified and/or waived to conform with such Federal or State Law or Decree, but such modification or waiver shall not modify or nullify any other provisions hereof.

SECTION 2. This Agreement shall be in full force and effect as of May 1, 2017 and shall remain in effect until May 1, 2021, and shall be automatically renewed for one (1) year consecutive terms unless either party serves a sixty (60) day written notice to amend or terminate this agreement.

| | | |
|---|---|---|
| Steve Barcus | | Bill Coleman |
| Floyd Clutter | Bill Bailey | |
| Nicole Murray | Mike Landess | |
| Jason Shinn | Marc Bogenschutz | |
| Doug Smith | Shane Babbitt | |
| | | Mike Chapman |
| | | Bill Susworth |
| | | John Randall |
| | | Mark Shannon |

## SCHEDULE A
## HOURLY RATES & PROFIT SHARING PLAN

*Lump sums will be effective as of 5/1 during the respective year paid in accordance with the payroll cycle

** Lead Person classification (NEW) The Company shall have the right to promote employees to Lead Person based on the employee's leadership skills, length of service and ability to fill in for other positions outside the bargaining unit. Promotions to Lead Person require a personal interview and are limited to the number of available positions. The Company shall have the sole discretion to determine the number of Lead Persons, to create or eliminate Lead Person positions and to remove employees from Lead Person positions. This classification will receive $1.00 per hour in addition to their current rate of pay.

Notes:

Preforming on a breakdown unit will pay based on the rate for the units used. When preforming, the heater from the unit being served will be assigned to heat on the breakdown unit.

The Company will post for one (1) Upset Hot Trim position on the first shift.

The Company will post for bid the 3500-3 Hammer operator as a pre-form unit. When there is a need for a hammer operator and there is no classified hammer operators available and the 35-3 pre-form operator is available he/she will be required to operate.

The hourly rate or bid rate for swingman will be Group 3 swing rate.

The current safety shoe allowance of $0.04/hour increased to $0.06/hour, effective 5/1/02.

A $0.02/hour allowance will be added to hourly rates for the purchase of leather leggings and aprons.

Appropriate group hot trimmer rate will be paid to employee assisting Upset Operator while manipulating steel in the die area to make a forging. Utility rate will continue to be paid for mopping or spraying dies, turning the forging, or helping knock a forging out of the dies.

When block dies are in 5000 lb. hammers, Operators will receive Group I, operator rate. This rate only applies while block dies are in unit. Holiday pay and vacation pay will be paid using Group II, operator rate.

25

### PROFIT SHARING PLAN

The Company will provide a profit sharing plan for current employees. Profit sharing calculations and plan designs will be communicated during the first quarter of every year.

### SCHEDULE "B"
### PLANT DEPARTMENTS

1. Forge Department

2. Upset Department

3. Cutting Department

4. Heat Treat Department

5. Grinding Department

### APPENDIX "A"
### AUTHORIZATION FOR
### CHECK-OFF FROM WAGES

To:_____(Employer)

I, _____, an employee of _____, hereby authorize and direct my employer to deduct from my wages and pay to the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, AFL-CIO, Local Lodge No. 1620, (herein the "Union"), an amount equal to dues, initiation fees, and reinstatement fees fixed by the Union. This authorization is voluntarily made in order to pay my fair share of the Union's costs of representing me for purposes of collective bargaining and this authorization is not conditioned upon my present or future membership in the Union. In addition, this authorization is made with the specific understanding that it is not a condition of employment with my employer.

This assignment, authorization and direction shall be irrevocable for a period of one (1) year from the date there-of or until the termination of the collective bargaining agreement between the employer and the Union, whichever occurs sooner, without regard to whether or not I am a Union member.

I agree and direct that this agreement, authorization, and direction shall be automatically renewed and shall be irrevocable for successive periods of one (1) year each or for the period of each succeeding applicable collective bargaining agreement between the employer and the Union, whichever shall be shorter, without regard to whether or not I am a member of the Union, unless written notice is given by me to the employer and the Local Union Secretary-Treasurer by registered mail not more than twenty (20) days and not less than ten (10) days prior to the expiration of each period of one (1) year

26

or of each applicable collective bargaining agreement between the employer and the Union, whichever occurs sooner.

_____
Print Name

_____
Signature

_____
Date

 **WYNNCHURCH | CAPITAL**

June 3, 2019

_VIA OVERNIGHT MAIL_

Todd Detro
Local President
International Brotherhood of Boilermakers, Iron Ship Builders,
   Blacksmiths, Forgers and Helpers, Local District Lodge No. 1620
3630 W. 300 N.
Portland, IN 47371

Dear Mr. Detro:

On June 3, 2019, Premier Forge Group, LLC, a wholly owned subsidiary of Wynnchurch Capital, LLC, ("Premier Forge" or the "Company"), and TDY Industries, LLC, a wholly owned subsidiary of Alleghany Technologies Incorporated, ("TDY"), finalized an Asset Purchase Agreement (the "Transaction"). As a result of the Transaction, Premier Forge acquired certain assets of TDY's forging business, including TDY's manufacturing facility located at 250 E. Lafayette St., Portland, IN 47371 ("Portland Facility").

Pursuant to a secondment agreement entered into between Premier Forge and TDY in connection with the Transaction, for a period of up to ninety (90) days following the closing date, TDY will continue to employ the employees at the Portland Facility ("Transition Period"). During the Transition Period, TDY will continue to be bound by its existing collective bargaining agreement with the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, Local District Lodge No. 1620 (the "Union"), which expires by its terms on May 1, 2021. Bargaining unit employees at the Portland Facility will not become employees of Premier Forge until the expiration of the Transition Period, expected to be on or about September 2, 2019 (the "Employee Transition Date").

Premier Forge will make offers of employment to all eligible bargaining unit employees at least two (2) days prior to the Employee Transition Date, on or around August 29, 2019. In connection with the Transaction, Premier Forge did not assume any labor or employment liabilities of TDY and, in particular, is not bound by, and will not adopt or assume, the terms of any collective bargaining agreement, supplemental agreement or other labor agreement between TDY (or any of its subsidiaries, including but not limited to ATI Forged Products, Portland Operations) and the Union. Premier Forge will offer employment to bargaining unit employees at the Portland Facility based on terms and conditions of employment established by the Company. Premier Forge plans to offer employment to all bargaining unit employees at their current hourly wage rates. No employee will have his/her wage rate reduced as a result of the Transaction. Premier Forge is not assuming any benefit plans from TDY and will be offering different benefit plans to its employees. Further, other terms and conditions of employment may change.

EXHIBIT

2

ALL-STATE LEGAL®

Tieki Pano
Local President
International Brotherhood of Boilermakers, Iron Ship Builders,
Blacksmiths, Forgers, and Helpers, Local District Lodge No. 1620
June 3, 2019
Page 2

Premier Forge is prepared to meet with the Union to discuss these initial terms and conditions of employment to be effective on the Employee Transition Date. Indeed, Premier Forge would prefer to negotiate a new collective bargaining agreement with the Union covering the bargaining unit at the Portland Facility ("Bargaining Unit")[1] that would become effective on the Employee Transition Date.

If, however, the Company and the Union do not reach an initial collective bargaining agreement prior to the Employee Transition Date, employees who accept employment with Premier Forge at the Portland Facility will work under initial terms and conditions of employment established by the Company. In the event a majority of the employees in the Bargaining Unit hired by Premier Forge at the Portland Facility were previously employed by TDY in the bargaining unit represented by the Union, Premier Forge will recognize the Union as the exclusive collective bargaining representative of the Bargaining Unit at the Portland Facility.

Our labor attorney, Brian Easley from the law firm Jones Day, will be contacting you to schedule dates to begin negotiations for an initial collective bargaining agreement. We look forward to meeting you and to cultivating a positive and productive relationship moving forward.

Sincerely,

Kevin Hanley
Vice President
Premier Forge Group Holdings, Inc.
as the Manager of Premier Forge
Group, LLC

cc:      Shane Babbit, Vice President, Boilermakers Local District Lodge No. 1620

---

[1] The term "Bargaining Unit" includes hourly production job classifications at the Portland Facility, to the extent currently represented by the Union, and excludes (i) all job classifications represented by the International Association of Machinists and Aerospace Workers Union District Lodge 90 and its Local Lodge 2018, including all job classifications in the Tool and Die Machine Shop and Maintenance Department at the Portland Facility, and (ii) all job classifications currently represented by the Chauffeurs, Teamsters, Warehousemen, and Helpers Local Union No. 135, including all lift truck operators, mechanized sweepers, and crane operators at the Portland Facility.



INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIP BUILDERS, BLACKSMITHS, FORGERS AND HELPERS

GRIEVANCE FORM

Local Lodge No. *1620*

Grievance No.

Department

Statement of Grievance:

Employee's Name *BOILERMAKERS L-1620*
*ON BEHALF OF REPRESENTED EMPLOYEES*
*OF ATI*

Date Filed *JUNE 7, 2019*

DATE OF CONTRACT VIOLATION: June 3, 2019

LOCATION: PORTLAND IN. FACILITY AND ELSEWHERE

DESCRIPTION: ATI BREACHED ARTICLE I OF THE AGREEMENT, AND ALL OTHER APPLICABLE ARTICLES. THE AGREEMENT IS BY AND BETWEEN ATI AND ITS SUCCESSOR OR ASSIGNS. WYNNCHURCH CAPITOL'S LETTER DATED JUNE 3, 2019 SENT TO THE UNIONS DEMONSTRATES ATI BREACHED THE AGREEMENT IN THAT THE AGREEMENT IS BINDING UPON SUCCESSORS AND ASSIGNS. ATI MAY HAVE BREACHED THE AGREEMENT IN OTHER WAYS AND THE LOCAL IS CONTINUING TO INVESTIGATE.

REMEDY: ATI AND ANY SUCCESSOR OR ASSIGNS REMAIN BOUND TO THE AGREEMENT. ATI IS REQUIRED TO SECURE FROM ANY PURCHASER, AS A CONDITION OF SALE, AN ASSUMPTION OF THE OBLIGATIONS IN THE AGREEMENT. ANY APPLICABLE MAKE WHOLE REMEDY FOR EMPLOYEES IMPACTED BY VIOLATIONS. EXPEDITED ARBITRATION IS REQUESTED. A STAY OF ANY SALE/ TRANSACTION, PENDING OR OTHERWISE, IS REQUESTED IN ORDER TO AFFORD THE EMPLOYEES AND THE LOCAL THE POSSIBILITY OF AN ADEQUATE REMEDY AND TO PROVIDE TIME FOR THE ARBITRATION PROCESS TO BE COMPLETED.

(Signed) _____

(Signed) _____
For the Union

Receipt of grievance acknowledged as of

*6/7/19*
Date

*2:00 PM*
Time

(Signed) _____
For the Company

EXHIBIT
3

6/13/19        9:52 AM              Step 1

We deny the submitted grievance.

The Collective Bargaining Agreement does not require that an asset purchaser assume the CBA as a condition of sale. Therefore, the grievance is denied.

Jamie Evans
The Company

ALL-STATE LEGAL®   EXHIBIT   4

MICHAEL J. STAPP (KS, MO, NE & IA)
SCOTT L. BROWN (KS, MO & IA)
MICHAEL E. AMASH (KS, MO & IA)
NATHAN S. TERRY (KS & MO)
MICHELLE R. LEVINE (KS & MO)
NATHAN J. HILL (KS & MO)
JASON R. McCLITIS (KS, MO & IA)
FREDERICK ZARATE (KS, MO, NE & NY)

Of Counsel
ROBERT J. HENRY (KS, MO, NE, IA & DC)
CHARLES R. SCHWARTZ (KS)
Retired
JOSEPH W. MORELAND (2012)
THOMAS H. MARSHALL (2014)
JAMES R. (DICK) WAERS (2018)

LAW OFFICES
# BLAKE & UHLIG, P.A.
753 State Avenue, Suite 475
Kansas City, Kansas 66101
913-321-8884
913-321-2396 Fax

Missouri Office
2500 Holmes
Kansas City, MO 64108
816-472-8883

Nebraska Office
13505 B Street
Omaha, NE 68144
402-991-6801

KATE M. CIGRAND (KS & MO)
AMANDA K. RHODES (KS & MO)
PAUL E. TORLINA (KS & MO)
ERIC W. KOBET (KS, MO & NY)
BRANDON E. WOOD (KS & MO)
ERIC C. BECKEMEIER (KS & MO)
DUSTIN L. WATKINS (FL, IL & MO)
SAMANTHA L. GROARK (MO)
ASHLEY N. SARCHET (MO)
NATHAN A. KAKAZU (MO)

———————

JOHN J. BLAKE (1928-2006)
ROBERT L. UHLIG (1929-1981)
RICHARD B. THOMPSON (1952-1981)
ROBERT L. DAMERON (1951-2001)

0055.0725

June 10, 2019

*Sent via Overnight Mail & Email*
Mr. Jason Shinn, ATI Plant Manager
ATI Forged Products
250 E. Lafayette St.
Portland, IN 47371
Jason.shinn@atimetals.com

Re:    June 7, 2019 Grievance

Dear Mr. Shinn:

Our office represents Boilermakers Local Lodge 1620 and the International Brotherhood of Boilermakers in connection with grievance challenging the purported sale, or potential sale, of the ATI Forged Products-Portland Operations to Premier Forge.

As stated in the grievance filed on June 7, 2019, the Unions are requesting expedited arbitration and a stay of the purported sale or potential sale.

Please expressly state whether ATI will agree to proceeding immediately to the arbitration, i.e., Step 5 of the arbitration procedure.

Please expressly state whether ATI will agree to stay the purported sale or potential sale pending the outcome of the grievance and arbitration procedure. If ATI declines, court action will be taken to ensure the Unions can receive an adequate remedy.

Of course, should Premier Forge assume the collective bargaining agreement, the grievance will seemingly be moot.


EXHIBIT
5
ALL-STATE LEGAL®

Mr. Jason Shinn, ATI Plant Manager
June 10, 2019
Page 2


Because time is of the essence, a response to this letter is requested by June 12, 2019.

Sincerely,

Jason R. McClitis

JRM/nmd

cc:  Mr. Tyler Brown, IBB ED-ISO
     Mr. Billy Staggs, IBB AD-ISO
     Mr. William Coleman, IBB IR-ISO
     Mr. Todd Detro, L-1620 Pres.

# Proof of Delivery

Dear Customer,

This notice serves as proof of delivery for the shipment listed below.

**Tracking Number**
1ZF425610192455154

**Weight**
0.00 LBS

**Service**
UPS Next Day Air®

**Shipped / Billed On**
06/10/2019

**Delivered On**
06/11/2019 10:46 A.M.

**Delivered To**
250 E LAFAYETTE ST
PORTLAND, IN, 47371, US
**Received By**

MULINCAMP

**Left At**
Dock

**Reference Number(s)**
0055.0725/JUNE 10, 2019

Thank you for giving us this opportunity to serve you. Details are only available for shipments delivered within the last 120 days. Please print for your records if you require this information after 120 days.

Sincerely,

UPS

Tracking results provided by UPS: 06/26/2019 4:15 P.M. EST

LAW OFFICES

MICHAEL J. STAPP (KS, MO, NE & IA)
SCOTT L. BROWN (KS, MO & IA)
MICHAEL E. AMASH (KS, MO & IA)
NATHAN S. TERRY (KS & MO)
MICHELLE R. LEVINE (KS & MO)
NATHAN J. HILL (KS & MO)
JASON R. McCLITIS (KS, MO & IA)
FREDERICK ZARATE (KS, MO, NE & NY)

## BLAKE & UHLIG, P.A.
753 STATE AVENUE, SUITE 475
KANSAS CITY, KANSAS 66101
913-321-8884
913-321-2396 FAX

MISSOURI OFFICE
2500 HOLMES
KANSAS CITY, MO 64108
816-472-8883

NEBRASKA OFFICE
13505 B STREET
OMAHA, NE 68144
402-991-6801

KATE M. CIGRAND (KS & MO)
AMANDA K. RHODES (KS & MO)
PAUL E. TORLINA (KS & MO)
ERIC W. KOBET (KS, MO & NY)
BRANDON E. WOOD (KS & MO)
ERIC C. BECKEMEIER (KS & MO)
DUSTIN L. WATKINS (FL, IL & MO)
SAMANTHA L. GROARK (MO)
ASHLEY N. SARCHET (MO)
NATHAN A. KAKAZU (MO)

Of Counsel
ROBERT J. HENRY (KS, MO, NE, IA & DC)
CHARLES R. SCHWARTZ (KS)
Retired
JOSEPH W. MORELAND (2012)
THOMAS H. MARSHALL (2014)
JAMES R. (DICK) WAERS (2018)

JOHN J. BLAKE (1928-2006)
ROBERT L. UHLIG (1929-1981)
RICHARD B. THOMPSON (1952-1981)
ROBERT L. DAMERON (1951-2001)

June 13, 2019

*Sent via Overnight Mail & Email*
Mr. Jason Shinn, ATI Plant Manager
ATI Forged Products
250 E. Lafayette St.
Portland, IN 47371
Jason.shinn@atimetals.com

Re:    Union Request for Information

Dear Mr. Shinn:

The Union writes to request information in order to effectively represent the bargaining unit employees. The request for information pertains to Wynnchurch Capital's letter dated June 3, 2019 and the representations made therein. The Union requests information to investigate in connection with its June 7, 2019 grievance, and to determine the potential impact of these representations on the bargaining unit at the Company's Portland, Indiana location.

Please note, for purposes of this letter, the term "Company" refers to both Allegheny Technologies Incorporated and TDY Industries, LLC.

In order to effectively represent the employees in the bargaining unit the following information is needed. Please provide the following information:

1.    Copies of all correspondence which concerns the possibility of sale of the Company, and any sale that relates to the Company.



Mr. Jason Shinn, ATI Plant Manager
June 13, 2019
Page 2

2.    Copies of minutes of the Company's board of directors regarding any possible sale or sale of the Company.

3.    Please provide the name, address, and phone number of each entity that is involved in the purchase and sale, or possible purchase or sale, of the Portland, Indiana facility being sold.

4.    Please indicate whether the Company or any of its present or former officers, directors, owners, managing agents or employees has, or will have, any ownership or management interest in any purchaser or in any aspect of the Portland, Indiana facility that are the object of the transaction to sell.

5.    Please provide copies of any internal memoranda, inter-office communications, or other documents that discuss the terms or proposed terms of the transaction, and/or approval or ratification (or proposed approval or ratification) of the decision to enter into this transaction to sell.

6.    Please provide copies of all documents that reflect any agreement or understanding, or proposed agreement or understanding, of any kind between the Company and the purchasers which were or may be entered into in connection with the transaction to sell.  This includes but is not limited to any asset purchase agreements, financing agreements, mortgages or security interests, instruments, notes, manufacturing agreements, assignments, subcontracting agreements, rental or use agreements/leases, licensing agreements, production agreements, or marketing agreements, or proposals of the same kind.

7.    Please provide copies of all documents setting forth any communications between the Company and any purchaser regarding the current collective bargaining agreements, the current bargaining unit employees, and/or the current bargaining relationship with the Union and/or the International Brotherhood of Boilermakers.  Please provide copies of any documents setting forth any agreements by any purchaser to assume all or any part of the terms of the current collective bargaining agreements.

8.    Copies of any document referenced in the June 3, 2019 letter from Wynnchurch Capital.

Mr. Jason Shinn, ATI Plant Manager
June 13, 2019
Page 3

     9.     Copies of any documents relied on in the June 3, 2019 letter from Wynnchurch Capital.

     The Union needs the above information as soon as possible and in order to fulfill its obligations to represent the employees covered by the terms of the collective bargaining agreement.

     If you intend to object to supplying any of the information, then please supply that information to which you are not objecting. Also, with respect to any information that you do not intend to supply please furnish an explanation as to why you believe you do not have to supply it.

     Because time of is the essence, a response is requested by June 20, 2019. Please note, while a response is requested by June 20, 2019, that is not meant to suggest that a full response and all documents are provided by such date; rather, it is imperative that this moves quickly for the reasons already stated in prior correspondence and the June 7, 2019 grievance.

     The Union may request additional information and does not waive any rights in connection with this letter.

Sincerely,

Jason R. McClitis

JRM/nmd

cc:    Mr. Tyler Brown, IBB ED-ISO
       Mr. Billy Staggs, IBB AD-ISO
       Mr. William Coleman, IBB IR-ISO
       Mr. Todd Detro, L-1620 Pres.

# Proof of Delivery

Dear Customer,

This notice serves as proof of delivery for the shipment listed below.

**Tracking Number**
1ZF425610199842384

**Weight**
0.00 LBS

**Service**
UPS Next Day Air®

**Shipped / Billed On**
06/13/2019

**Delivered On**
06/14/2019 10:46 A.M.

**Delivered To**
250 E LAFAYETTE ST
PORTLAND, IN, 47371, US
**Received By**

MULINCAMP

**Left At**
Dock

**Reference Number(s)**
0055.0725 / JUNE 13, 2019

Thank you for giving us this opportunity to serve you. Details are only available for shipments
delivered within the last 120 days. Please print for your records if you require this information after
120 days.

Sincerely,

UPS

Tracking results provided by UPS: 06/26/2019 4:13 P.M. EST



**OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.**

*Attorneys at Law*

111 Monument Circle, Suite 4600
Indianapolis, IN 46204
Telephone: 317-916-1300
Facsimile: 317-916-9076
www.ogletree.com

Matthew J. Kelley
317-916-2520
matthew.kelley@ogletreedeakins.com

June 17, 2019

**VIA FACSIMILE AND U.S. REGULAR MAIL**
Jason R. McClitis
BLAKE & ULIGH, P.A.
753 State Avenue, Suite 475
Kansas City, Kansas 66101
913-321-2396 (fax)

RE:   ATI forged Products- June 7, 2019 Grievance

Dear Mr. McClitis:

I represent Allegheny Technologies Incorporated. I am in receipt of your letter dated June 10, 2019 regarding the asset sale recently concluded at the ATI Forged Products plant located at 250 E. Lafayette Street in Portland Indiana.

ATI denied the grievance on June 11, 2019, based upon the complete lack of any successorship language in the current collective bargaining agreement that binds ATI to condition the sale of assets on the purchaser assuming the current collective bargaining agreement. As the sale of the assets has already closed, the Union's demand to stay the sale pending the outcome of the grievance is both impossible and moot. In response to your request, ATI will not agree to any expedited arbitration request in this matter.

The grievance is frivolous and without basis in either contractual or legal terms. The arbitration provision in the agreement specifically states that the arbitrator "shall have no authority or jurisdiction to add to, detract from, or alter the terms and conditions of the Agreement." As the Agreement does not contain any language that binds an asset purchaser to the terms of the current agreement, there is simply no language to "interpret." Therefore, it can be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the dispute. In *Gateway Coal Co v. Mine Workers District 4, Local 6330*, 414 U.S. 368 (1974).

Please direct any additional communication regarding this matter to me.

Sincerely,

Matthew J. Kelley

MJK:arm
CC: Floyd Clutter *(via email)*

38954127.1

Atlanta ▪ Austin ▪ Berlin (Germany) ▪ Birmingham ▪ Boston ▪ Charleston ▪ Charlotte ▪ Chicago ▪ Cleveland ▪ Columbia ▪ Dallas ▪ Denver ▪ Detr
Indianapolis ▪ Jackson ▪ Kansas City ▪ Las Vegas ▪ London (England) ▪ Los Angeles ▪ Memphis ▪ Mexico City (Mexico) ▪ Miami ▪ Milwauk
Nashville ▪ New Orleans ▪ New York City ▪ Oklahoma City ▪ Orange County ▪ Paris (France) ▪ Philadelphia ▪ Phoenix ▪ Pittsburgh ▪ Portlan
Richmond ▪ St. Louis ▪ St. Thomas ▪ Sacramento ▪ San Antonio ▪ San Diego ▪ San Francisco ▪ Seattle ▪ Stamford ▪ Tampa ▪ Toronto (Canada) ▪

EXHIBIT

7

ALL-STATE LEGAL®

# GRIEVANCE RECORD

STEP 1 —                                    Date

Company proposal

Settled on above basis (Check "Yes" or "No")   Yes ☐   No ☑

_Jamie Evans_                              _____  6-14-19
For the Company                            For the Union

STEP 2 —                                    Date

Company proposal

Settled on above basis (Check "Yes" or "No")   Yes ☐   No ☐

For the Company                            For the Union

STEP 3 —                                    Date

Company proposal

**EXHIBIT**

8

Settled on above basis (Check "Yes" or "No")   Yes [ ]   No [✓]

_Jamie Evans_
For the Company

_Todd Datu_   6-19-19
For the Union

STEP 2 —

Date

Company proposal   Grievance is denied

Settled on above basis (Check "Yes" or "No")   Yes [ ]   No [✓]

_Jamie Evans_  6/19/19

_Todd Datu_   6-25-19
For the Company                                    For the Union

Date

P 3 —

Company proposal   Grievance denied

Settled on above basis (Check "Yes" or "No")   Yes [ ]   No [✓]

_Jamie Evans_  6/25/19

_Todd Datu_   6-25-19

EXHIBIT

9